**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| **LARRY HANSEN,** *on behalf of J.H., a minor*, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **Case No. 09-3119-CV-S-RED** |
| ) | |
| **REPUBLIC R-III SCHOOL DISTRICT,** ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

Now before the Court is Defendant's Motion for Judgment on the Administrative Record (Doc. 14) and Plaintiff's Motion for Judgment on the Record (Doc. 23). After careful consideration and for the reasons detailed below, the Court **DENIES** Defendant's Motion (Doc. 14) and **GRANTS** Plaintiff's Motion (Doc. 23).

## BACKGROUND

J.H. ("JH"), a minor, claims an Administrative Due Process Panel incorrectly found that he was not disabled under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 - 1482 (the "IDEA"). JH's parents divorced and following a custody battle JH moved from his mother's custody in Iowa to his father's custody in Springfield, Missouri.

JH had erratic behavior. At school JH made a death threat, which he followed with hysterical laughter and telling his dad it was all a joke. The teacher called his laughter "out of place and scary." On three separate occasions JH expressed his desire to die and made other suicidal comments. JH would change from being happy-go-lucky to being very angry. JH had five disciplinary referrals and thirteen days of suspension in September 2007 alone. From August to December 2008, during JH's seventh grade year, JH received approximately 25 disciplinary

referrals.

JH also had academic difficulty. Because JH was not succeeding academically, Defendant Republic School District ("Republic") planned for him to attend summer school, receive tutoring, and take a placement test to advance to the sixth grade. JH also had to take a standardized test to advance to the seventh grade, which he failed the first time. The second time when he was on medication he was successful. For the Fall 2008 semester, JH received all failing grades other than one D-.

On May 11, 2007, JH's father asked Republic to evaluate JH for IDEA eligibility. Republic investigated whether there was any reason to suspect a disability and concluded there was no such reason. Several months later, JH's father again asked Republic to ascertain whether JH had a disability. This time the staffing team found reason to suspect a disability and agreed to further evaluate JH.

To gather more information, the team hired Dr. Petrovich to evaluate JH in the social, emotional, and academic areas. Before Dr. Petrovich had the opportunity to evaluate JH, JH was evaluated by Dr. Anna Ross Hertel. Dr. Hertel diagnosed JH with conduct disorder, bipolar disorder not otherwise specified, and gave JH a rule-out diagnosis of attention deficit hyperactivity disorder ("ADHD"). Giving a rule-out diagnosis indicates that some, but not all characteristics of the disease are present and more testing is needed to give a definitive answer. Using Dr. Hertel's data, Dr. Petrovich diagnosed JH with conduct disorder and gave a rule-out diagnosis with respect to bipolar disorder and ADHD.

After reviewing all data, the staffing team concluded that JH did not have an educational disability, but rather was only socially maladjusted and therefore outside the scope of the IDEA.

2

After Republic made its decision, JH visited Dr. Colby Wang. Dr. Wang met with JH several times a month and became JH's treating psychiatrist. Dr. Wang diagnosed JH with conduct disorder, mixed type bipolar disorder, and ADHD, and gave a rule-out diagnosis of post-traumatic stress disorder. JH's father then requested an administrative due process hearing. After hearing JH's case-in-chief, the Due Process Panel gave a directed verdict to Republic, finding JH failed to prove that he was disabled under the IDEA.

## STANDARD OF REVIEW

When "reviewing a final determination of a state administrative panel's resolution of an IDEA claim," district courts give "due weight to the state proceedings." *Strawn v. Mo. State Bd. of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000). Giving "due weight" is necessary "because the administrative panel had the opportunity to observe the demeanor of the witnesses and because the court should not substitute its own notions of sound educational policy for those of the school authorities that they review." *Id*. This Court must make "an independent ruling based on the preponderance of the evidence." *Town of Burlington v. Dep't of Educ. for the Commonwealth of Mass.*, 736 F.2d 773, 790 (1st Cir. 1984); 20 U.S.C. § 1415(i)(2)(C).

## ANALYSIS

**A.**   **The Due Process Panel erred in finding JH was not disabled under the IDEA**

JH argues he qualified as disabled under 20 U.S.C. § 1401(3)(A) because he had a "serious emotional disturbance" or an "other heath impairment," which adversely affected his educational performance.

**1.**   **JH's impairments adversely affected his educational performance**

Republic argues there is no evidence showing JH's impairments, if any, adversely affected

3

his educational performance. In *Eschenasy v. New York City Department of Education*, 604 F. Supp. 2d 639 (S.D. N.Y. 2009), the court overturned the administrative panel's ruling that there was no adverse affect on a student's educational performance because the panel's ruling was "directly contradicted by Ann's failing grades, repeated expulsions, suspensions, need for tutors and need for summer school." *Id*. at 647.

Based on *Eschenasy*, JH's impairments adversely affected his scholastic performance. JH was like Ann in that he had failing grades, and repeated expulsions and suspensions. Also similar to Ann, JH planned to attend summer school, receive tutoring, and take a placement test in order to advance to the sixth grade. Further, Matt White, Republic's director of special services, opined that JH's behavior affected his education. Based on these facts, the preponderance of the evidence shows an adverse affect on JH's educational performance.

### 2. JH suffered from a "serious emotional disturbance"

A "serious emotional disturbance" is "a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance: (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors. (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers. (C) Inappropriate types of behavior or feelings under normal circumstances. (D) A general pervasive mood of unhappiness or depression. (E) A tendency to develop physical symptoms or fears associated with personal or school problems." 34 C.F.R. § 300.8(c)(4)(i). Socially maladjusted children do not qualify unless the requirements of section 300.8(c)(4)(i) are met. *Id*. A child with bipolar disorder may qualify as emotionally disturbed if the criteria are met. *See Reese ex rel. Reese v. Bd. of Educ. of Bismarck R-V Sch. Dist.*, 225 F. Supp. 2d 1149, 1151 n.

4 (E.D. Mo. 2002) (finding a child disabled under the IDEA who had been diagnosed with bipolar disorder, numerous other emotional and learning problems, and who had a history of violent behavior). Children who are seriously emotionally disturbed typically exhibit characteristics such as "verbal aggression, physically assaultive behavior, authority conflicts, depression, despondency, and/or mood swings." *Tracy v. Beaufort County Bd. of Educ.*, 335 F. Supp. 2d 675, 689 (D. S.C. 2004). JH argues over a long period of time and to a marked degree he was unable to build or maintain satisfactory interpersonal relationships with peers and teachers and that he exhibited inappropriate types of behavior or feelings under normal conditions.

### *a. JH was unable to build or maintain satisfactory interpersonal relationships over a long period of time and to a marked degree*

Relying on *Springer v. Fairfax County School Board*, 134 F.3d 659 (4th Cir. 1998), Republic argues JH did not suffer from a serious emotional disturbance. In *Springer*, the Fourth Circuit concluded a student was merely socially maladjusted and did not suffer from a serious emotional disturbance, despite the student's argument that he was unable to build or maintain personal relationships. *Id*. at 665. In that case, teachers, students, the student's father, and the student himself all opined that the student could build and maintain close personal relationships. *Id*. His parents described him as "respectful of teachers and appropriate," and his history teacher described him as "very friendly with peers and me." *Id*.

Republic argues Matt White's testimony proves JH was able to maintain interpersonal relationships. White testified that JH did well with some teachers, but not well with others. Contrary to Republic's assertions, there was evidence in the record strongly establishing JH was unable to maintain satisfactory interpersonal relationships. Specifically, JH was disciplined numerous times for being disrespectful to staff and peers and for fighting with classmates. In the

first semester of JH's seventh grade year JH received 25 disciplinary referrals. Peggy Defazio, a Republic employee who worked with JH, found that JH's "hyperactivity, impulsivity, inattention, defiant behaviors and limited social skills" severely interfered with JH's ability to succeed socially and academically. Taking the record as a whole, the preponderance of the evidence established that JH was unable to build and maintain satisfactory interpersonal relationships over a long period of time and to a marked degree. Furthermore, Republic's reliance on *Springer* is unfounded. The record clearly demonstrates that JH was not "respectful of teachers and appropriate" or "very friendly." Based on this criteria alone, JH suffered from a "serious emotional disturbance," meaning JH had a disability under the IDEA.

> **b.** ***JH did not prove he had inappropriate types of behavior or feelings under normal circumstances***

JH argues there was sufficient evidence to show he acted inappropriately under normal circumstances. JH offered evidence that he made suicidal comments; that he was disciplined approximately 25 times in one semester for being disrespectful to teachers and peers and fighting with classmates; that he made a death threat and then laughed in a scary and inappropriate manner; and that he would change from happy-go-lucky to being very angry. However, JH failed to show that his behavior was not caused by his parents' divorce and being removed from his mother's custody in Iowa. Under Missouri's State Plan, this criteria excludes children who demonstrate problems of everyday living and/or those who develop transient symptoms due to a specific crisis or stressful experience. Missouri State Plan, Reg. III, pg. 23 (2010). One witness testified that the custody issues in the back of JH's head could "sometimes precipitate [JH's] volatility." Because JH did not offer evidence showing he exhibited the same behavior prior to the divorce and change in custody, JH did not prove that he felt or behaved inappropriately "under normal circumstances."

6

### 3. JH also suffered from an "other health impairment"

A child suffers from an "other health impairment" if a child has "limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment that i) is due to chronic or acute health problems such as . . . [ADHD], and ii) adversely affects a child's educational performance." 34 C.F.R. § 300.8(c)(9). Republic argues the record does not support concluding that JH suffered from ADHD because two psychologists merely gave a rule-out diagnosis of ADHD. The Court disagrees.

The record made before the Due Process Panel was limited to the evidence presented by JH and his father, since the Panel rendered a directed verdict before Republic presented its case. The evidence in the record on this "other health impairment" issue was contained in the testimony of Dr. Anna Ross Hertel, a psychologist, and Dr. Colby Wang, a psychiatrist. Dr. Hertel administered a battery of tests to JH and based on her personal interview and the test results she rendered her opinion. Dr. Wang saw JH after he was tested by Dr. Hertel and actually became JH's treating doctor and began a regimen of medication for JH. At the hearing, the pertinent opinions rendered by these two doctors were as follows:

Dr. Hertel:

> 1. Bipolar Disorder not otherwise specified (Tr. VI, p. 77, l. 24)
>
> Bipolar Disorder not otherwise specified "is a severe mood disorder where the individual's mood ranges from depressed to hypomanic to manic and even mixed-mood episodes." (Tr. VI, p. 78, l. 2-6)
>
> 2. Conduct Disorder (Tr. VI, p. 77, l. 25)

7

"Behavioral observations were certainly suggestive of the conduct disorder, forms that were completed by parents and teachers, as well as clinical interview (sic) and supporting psychological testing data." (Tr. VI, p. 79, l. 15-19)

3. Rule-out ADHD, combined type (Tr. VI, p. 82, l. 13-14)

JH "displayed a number of criteria for ADHD, such as hyperactivity, impulsivity, difficulty concentrating. I attributed those symptoms to his mood disorder and gave the ADHD as a rule-out. The rule-out does not mean the person does not have the disorder. When you give it as a rule-out, it means there's a very good likelihood the person has the disorder." (Tr. VI, p. 83, l. 2-9)

Dr. Wang:

1. Bipolar Disorder mixed type (Tr. VI, p. 24, l. 6)

"[T]he main point of bipolar disorder is that you have a larger-than-normal fluctuation of your mood which is not under your control." (Tr. VI, p. 26, l. 2-4)

2. Conduct Disorder (Tr. VI, p. 24, l. 10-11)

This "was mild, so he barely met that disorder, but fulfilled the criteria in terms of his threatening behavior and some physical violence." (Tr. VI, p. 24, l. 11-13)

3. ADHD both inattentive and hyperactive (Tr. VI, p. 24, l. 8)

"The main characteristics are inattentiveness, impulsivity, hyperactivity, lack of attention." (Tr. VI, p. 28, l. 12-14)

It is unclear from the record how much consideration the Panel gave to the report prepared by Dr. Petrovich, a psychologist, who based his opinion on the data gathered by Dr. Hertel. It is clear that Dr. Petrovich did not testify, thus his opinions were not explained. He did make a finding

of rule-out diagnosis of ADHD. This Court finds that in light of this evidence as presented in this record it is clearly established by a preponderance of the evidence that JH suffered from both bipolar disorder and ADHD. ADHD meets the requirements for an "other health impairment." The Panel did not discuss their decision making. However, in light of the absence of any contrary evidence to the well established opinions of Dr. Hertel and Dr. Wang, there can be only one logical conclusion i.e. that JH suffered from an "other health impairment." JH is disabled under the IDEA because JH suffers from a serious emotional disturbance and an other health impairment and those conditions adversely affected JH's educational performance.

**B.      Republic did not fail to evaluate JH in a timely manner pursuant to its child-find obligations**

Under 20 U.S.C. § 1412(a)(3)(A), school districts must ensure that "all children with disabilities . . . regardless of the severity of their disabilities . . . who are in need of special education and related services, are identified, located, and evaluated." The child-find duty was triggered when Republic had reason to suspect JH had a disability. *See Dep't of Educ., State of Haw. v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1194 (D. Haw. 2001). JH asserts Republic should have evaluated him prior to February 2008 because Republic knew about his failing grades and suicidal comments. JH cites evidence that from November 2006 to February 2008 he received several disciplinary referrals, was placed on homebound by Republic, and threatened suicide while at school on at least three separate occasions. However, Republic was only put on notice of JH's potential disability when JH's father asked Republic to investigate on May 11, 2007. Given the timing of JH's father's request - at the end of the school year - Republic's investigation of JH in August 2007 was timely. Republic complied with its child-find obligations because it was not put on notice of JH's disability until May 2007 and thereafter Republic investigated JH to determine if he suffered from an

9

Case 6:09-cv-03119-RED    Document 33    Filed 02/05/10    Page 9 of 10

educational disability.

## C. Attorneys' Fees

Larry Hansen, JH's father, seeks attorneys' fees. Under 20 U.S.C. § 1415(i)(3)(B)(i)(I), this Court, "in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." The Court reserves its ruling on this request until Mr. Hansen provides the Court with an affidavit in support of his request for attorneys' fees. The affidavit shall include a detailed list of all fees Mr. Hansen seeks.

## CONCLUSION

JH's conditions adversely affected his educational performance, as evidenced by his very low grades, need for tutoring and need for summer school. JH suffers from a "serious emotional disturbance" because he showed by a preponderance of the evidence that he was unable to build and maintain satisfactory interpersonal relationships to a marked degree and over a long period of time. JH also proved by a preponderance of the evidence that he suffered from an "other health impairment" because of the diagnoses related to ADHD. Based on these findings, JH suffered from a disability under the IDEA. Republic complied with its child-find obligations by timely investigating JH to determine whether there was reason to suspect JH of having an educational disability. The Court reserves judgment on Larry Hansen's request for attorneys' fees until Mr. Hansen files an affidavit with the Court detailing the fees he seeks.

**IT IS SO ORDERED**.

DATED: February 3, 2010      */s/ Richard E. Dorr*
                              RICHARD E. DORR, JUDGE
                              UNITED STATES DISTRICT COURT